1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Daniel E. Birkhaeuser (SBN 136646)
BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER,
2125 Oak Grove Road, Suite 125
Walnut Creek, CA 94598
Telephone: 925-945-0200
Email: dbirkhaeuser@bramsonplutzik.com

Timothy D. Battin (*pro hac vice* forthcoming)
Shinae Kim-Helms (Bar Number 242484)
Nathan M. Cihlar (*pro hac vice* forthcoming)
Joshua Q. Callister (*pro hac vice* forthcoming)
STRAUS & BOIES, LLP
4041 University Drive, Fifth Floor
Fairfax, VA 22030
Telephone: (703) 764-8700
Facsimile: (703) 764-8704
Email: tbattin@straus-boies.com
Email: skimhelms@straus-boies.com
Email: ncihlar@straus-boies.com
Email: jcallister@straus-boies.com

Attorneys for Plaintiff
Jacob DeVinney, DDS

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

Dr. Jacob DeVinney, DDS

Plaintiff,

v.

Delta Dental Plan Association; Delta Dental Insurance Company; DeltaUSA; Delta Dental of Arizona; Delta Dental of Arkansas; Delta Dental of California; Delta Dental of Colorado; Delta Dental of Delaware; Delta Dental of the District of Columbia; Hawaii Dental Service; Delta Dental of Idaho; Delta Dental of Illinois; Delta Dental of Indiana; Delta Dental of Iowa; Delta Dental of Kansas; Delta Dental of Kentucky; Maine Dental Service Corp.; Delta Dental of Massachusetts; Delta Dental of Michigan; Delta Dental of Minnesota; Delta Dental of Missouri; Delta Dental of ebraska; Delta Dental of New Hampshire; Delta Dental of New Jersey; Delta Dental of New Mexico; Delta Dental of New York;

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

1
2
3
4
5
6
7
8
9

Delta Dental of North Carolina; Northeast Delta
Dental (of Maine, New Hampshire and Vermont);
Delta Dental of Ohio; Delta Dental of Oklahoma;
Delta
Dental of Oregon; Delta Dental of Pennsylvania;
Delta Dental of Puerto Rico; Delta Dental of Rhode
Island; Delta Dental of South Dakota; Delta Dental of
Tennessee; Delta Dental of Vermont, Inc.; Delta
Dental of Virginia; Delta Dental of Washington; Delta
Dental of West Virginia; Delta Dental of Wisconsin;
and Delta Dental of Wyoming.

Defendants.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1.      Plaintiff, Dr. Jacob DeVinney, individually and on behalf of all others similarly

situated, brings this action for (a) injunctive relief on behalf of a nationwide class of dentists in the

Delta Dental provider network; (b) damages on behalf of a California class of dental service

providers, against: (1) the Delta Dental Plan Association ("DDPA") and its subsidiary, Delta USA;

(2) the 39 independent Delta Dental companies (collectively, "Plans"), which are: Delta Dental

Insurance Company ("DDIC"); Delta Dental of Arizona ("Delta Arizona"); Delta Dental of

Arkansas ("Delta Arkansas"); Delta Dental of California ("Delta California"); Delta Dental of

Colorado ("Delta Colorado"); Delta Dental of Delaware ("Delta Delaware"); Delta Dental of the

District of Columbia ("Delta District of Columbia"); Hawaii Dental Service ("HDS"); Delta Dental

of Idaho ("Delta Idaho"); Delta Dental of Illinois ("Delta Illinois"); Delta Dental of Indiana ("Delta

Indiana"); Delta Dental of Iowa ("Delta Iowa"); Delta Dental of Kansas ("Delta Kansas"); Delta

Dental of Kentucky ("Delta Kentucky"); Maine Dental Service Corp. ("Delta Maine"); Delta

Dental of Massachusetts ("Delta Massachusetts"); Delta Dental Plan of Michigan ("Delta

Michigan"); Delta Dental of Minnesota ("Delta Minnesota"); Delta Dental of Missouri ("Delta

Missouri"); Delta Dental of Nebraska ("Delta Nebraska"); Delta Dental Plan of New Hampshire,

Inc. ("Dental New Hampshire"); Delta Dental of New Jersey, Inc. ("Delta New Jersey"); Delta

Dental of New Mexico, Inc. ("Delta New Mexico"); Delta Dental of New York, Inc. ("Delta New York"); Delta Dental of North Carolina ("Delta North Carolina"); Delta Dental Plan of Ohio, Inc. ("Delta Ohio"); Delta Dental Plan of Oklahoma ("Delta Oklahoma"); Oregon Dental Service ("Delta Oregon"); Delta Dental of Pennsylvania ("Delta Pennsylvania"); Delta Dental of Puerto Rico, Inc. ("Delta Puerto Rico"); Delta Dental of Rhode Island ("Delta Rhode Island"); Delta Dental of South Dakota ("Delta South Dakota "); Delta Dental of Tennessee, Inc. ("Delta Tennessee"); Delta Dental of Vermont, Inc. ("Delta  Vermont"); Delta Dental of Virginia ("Delta Virginia"); Delta Dental of Washington ("Delta Washington"); Delta Dental of West Virginia ("Delta West Virginia"); Delta Dental of Wisconsin ("Delta Wisconsin"); and Delta Dental of Wyoming ("Delta Wyoming").  Defendants are referred to collectively herein as "Delta Dental" or "Defendants."

## INTRODUCTION AND SUMMARY

2.    This case arises out of a long-running conspiracy among the DDPA and its member companies and affiliates with the purpose and effect of allocating market share, fixing prices, and committing other unlawful practices designed to suppress compensation for dental healthcare providers like the Plaintiff to levels below what would prevail in a competitive marketplace.  The conspiracy had, and has, the purpose and effect of fixing and lowering the reimbursement rates dental healthcare providers receive in the United States.

3.    Plaintiff, an individual dental professional who is part of the Delta Dental of California network, brings this class action on behalf of dental providers nationwide to enjoin the ongoing illegal agreements entered into by Delta Dental of California, the Delta Dental Plans Association, and all other Delta Dental plans. This agreement was made to allocate markets in violation of the prohibitions of the Sherman Act and California law.  In addition, this action seeks to recover damages for a class of dental providers

4.      Defendants, part of a self-described network of independent companies operating under the Delta Dental name, conduct business in all 50 states, the District of Columbia, and Puerto Rico.  Defendants are all members of the DDPA.  The members of DDPA control DDPA and its policies.

5.      Defendant Plans are potential competitors that have agreed to allocate their business into exclusive geographic markets.  To enforce these markets Defendants Plans created and executed license agreements issued by Defendant DDPA, which is controlled by the Defendant Plans.  These license agreements limit and restrict the ability of Defendant Plans to compete outside of their respective territorial markets and constitute horizontal territorial market allocations that are *per se* unlawful.  Intent on maintaining control of the DDPA, member plans' officers sit on the board of the DDPA, serve as the principal officers of the DDPA, and as a result effectively maintain "complete and unfettered control over the operations of the association."  *United States v. Topco Associates, Inc.*, 405 U.S. 596, 599 (1972).

6.      The Supreme Court has further held that "[o]ne of the classic examples of a *per se* violation of [Sherman Act] § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition . . . This Court has reiterated time and time again that '[h]orizontal territorial limitations … are naked restraints of trade of no purpose except stifling of competition.'" *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49 (1990) (citing *Topco* at 608).  Like in *BRG*, the DDPA member plans "have agreed not to compete in the other's territories.  Such agreements are anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other." *Id*. at 49-50.  A recent decision from the Northern District of Alabama reaffirmed that analogous territorial restrictions by members of the Blue Cross Blue Shield Association were subject to *per se* review under the Sherman Act. *In re Blue Cross Blue*

*Shield Antitrust Litig.*, 308 F.Supp.3d 1241 (N.D. Ala. 2018) ("BCBS"), *appeal denied*, 2018 WL 7152887 (11th Cir. Dec. 12, 2018).

7.     The WIPO Arbitration and Mediation Center reported that, according to DDPA, "its business is operated through 39 member companies" that are "licensed to offer services under the DELTA DENTAL mark in specific regions of the US.  Each company has to use the mark in its company or legal trading name together with a geographic indicator describing its territory." Indeed, as noted by A.M Best Research, "[e]ach Delta Dental plan's operations are restricted to the state of domicile."[1]

8.     The standard market allocation agreement sets forth limitations on the Plans' ability to compete.  No "Delta Dental" plan is permitted to expand operations into another state or region where another "Delta Dental" plan is operating.

9.     The Plans have followed these restrictions, resulting in less competition.  However, the Plans have realized that the restrictions create certain limitations on seeking profitable business opportunities outside of their exclusive areas.  "Some plans have recognized that the restrictions of the brand curtail opportunities for growth in underserved regions of other states.  This has prompted the development of nonbranded products."[2]

10.     This restriction on competition and growth has led to individual Plans enjoying remarkable market dominance.  The Plans' agreement not to compete has entrenched and perpetuated their dominant market positions in their exclusive markets by preventing other Delta

---

[1] A.M. Best Research, *Delta Dental Plans Strengthen Ties as New Innovations Unfold* 2 (Oct. 13, 2008), http://www3.ambest.com/bestweekpdfs/sr795299508011full.pdf .

[2] *Id*. at 5.

Plans from competing in those areas. Their market power is the direct result of the illegal

conspiracy to divide and allocate markets unlawfully.

11.     The market allocation and resulting dominant market power has resulted in dental

providers who are members of the Delta Dental provider network (hereinafter referred to as "Delta

Dental Providers") receiving compensation below levels that would have existed in competitive

markets.

12.     As a result of Defendants' agreed-upon territorial restraints, Delta Dental's

compensation to dental service providers was collusively and unlawfully suppressed below the

level that would prevail in a competitive marketplace.

13.     Without judicial intervention Defendants' illegal actions will continue. To remedy

the injury caused by Defendants' actions, Plaintiff brings this case seeking to enjoin Delta Dental

from continuing its illegal practices. Plaintiff therefore asks the Court (a) to certify a nationwide

class action for injunctive relief—the "Injunction class"—under Fed. R. Civ. P. 23(b)(2) and to

certify a California damages class—the "California class"—under Fed. R. Civ. P. 23(b)(3) for

treble damages.

14.     The Injunctive relief class is defined as follows:

> All Delta Dental Providers, not owned or employed by any of the
> Defendants, that provide dental goods or services to Delta Dental
> insureds pursuant to a Delta Dental insurance policy within the United
> States and its territories.

15.     The California class is defined as follows:

> All Delta Dental Providers in the State of California, not owned or
> employed by any of the Defendants, that provided dental goods or
> services to a Delta Dental insured pursuant to a Delta Dental insurance
> policy within the State of California and within four years of the date
> of filing of this action.

1

2

## PARTIES

3

### A.    Plaintiff

4

16.    Plaintiff Jacob DeVinney is a dental services provider and a citizen of the State of

5

California.  He is a member of Amador Dental and Orthodontic, a family dental practice located at

6

5000 Pleasanton Ave., St. 110, Pleasanton, CA 94566.  During the relevant time period, Dr.

7

DeVinney provided dental goods and services to consumers insured by Defendants pursuant to his

8

in-network contract with Delta California. Dr. DeVinney was deprived of the choice of selecting

9

from the larger number of dental insurance networks that would have been present in the market

10

but for Defendants' actions, leading to a reduction in reimbursement for services Dr. DeVinney

11

12

provided.  Dr. DeVinney has been injured in his business or property as a result of Defendants'

13

violation of the antitrust laws.

14

### B.    Defendants

15

16

17.    Defendant DDPA is an Illinois nonprofit corporation located at 1515 West 22nd St.,

17

Ste. 450, Oak Brook, IL 60523.  DDPA is a national association of 39 independent Delta Dental

18

companies.  The DDPA's Board of Directors is composed almost entirely of the chief executive

19

officers of the member plans of the DDPA. The member Plans vote on DDPA's actions and elect

20

its officers, who are often officers of an individual Plan.

21

18.    Defendant DeltaUSA is an Illinois nonprofit corporation located at 1515 West 22nd

22

St., Ste. 450, Oak Brook, IL 60523.  Throughout the class period, DeltaUSA was a subsidiary of

23

24

DDPA and acted in concert with DDPA and the Plans to devise and implement the alleged

25

contract, combination or conspiracy.  The member Plans of the DDPA vote on DeltaUSA's actions

26

and elect its officers, who are often officers of individual Plans.

27

28

---

19.    Defendant DDIC is a Delaware Corporation with its principal place of business at 560 Mission St., #1300, San Francisco, CA 94105.  DDIC represents that it offers and administers Delta Dental PPO and other fee-for-service dental programs in Alabama, Florida, Georgia, Louisiana, Mississippi, Montana, Nevada, and Utah.  DDIC also reports that it offers and administers fee-for-service dental programs and provides a dental provider organization plan in Texas.

20.    Defendant Delta Arizona is an Arizona nonprofit corporation located at 5656 West Talavi Blvd., Glendale, AZ 85306 and also conducts business as Delta Dental Plan of Arizona, Inc. and uses the trade name Delta Dental of Arizona.

21.    Defendant Delta Arkansas is an Arkansas corporation located at 1513 Country Club Road, Sherwood, AR 72120.

22.    Defendant Delta California is a California corporation located at 560 Mission St., #1300, San Francisco, CA 94105.

23.    Defendant Delta Colorado is a Colorado corporation located at 4582 S. Ulster St., Ste. 800, Denver, CO 80237.

24.    Defendant Delta Connecticut shares an address with Defendant Delta New Jersey at 1639 Rte. 10, Parsippany, NJ 07054.

25.    Defendant Delta Delaware is a Delaware corporation located at One Delta Drive, Mechanicsburg, PA 17055.

26.    Defendant Delta District of Columbia is a District of Columbia corporation located at One Delta Drive, Mechanicsburg, PA 17055.

27.    Defendant HDS is a Hawaii corporation located at 700 Bishop St., Ste. 700, Honolulu, HI 96813.

28.     Defendant Delta Idaho is an Idaho corporation located at 555 E. Parkcenter Blvd., Boise, ID 83706.

29.     Defendant Delta Illinois is an Illinois corporation located at 111 Shuman Blvd., Naperville, IL 60563.

30.     Defendant Delta Indiana is an Indiana corporation located at 225 S. East St., Ste. 358, Indianapolis, IN 46202.

31.     Defendant Delta Iowa is an Iowa nonprofit corporation located at 9000 Northpark Drive, Johnston, IA 50131.

32.     Defendant Delta Kansas is a Kansas nonprofit corporation located at 1619 N. Waterfront Parkway, Wichita, KS 67206.

33.     Defendant Delta Kentucky is a Kentucky nonprofit corporation located at 10100 Linn Station Rd., Ste. 700, Louisville, KY 40223, and may also conduct business under the assumed name of Delta Dental Plan of Kentucky, Inc.

34.     Defendant Delta Maine does business as Delta Dental Plan of Maine, Inc. and is a Maine nonprofit corporation located at 1022 Portland Rd., Ste. Two, Saco, ME 04072-9674.

35.     Defendant Delta Massachusetts is a Massachusetts corporation located at 465 Medford St. Boston, MA 20129, and Delta Massachusetts may also conduct business under the name of Delta Dental of Massachusetts.

36.     Defendant Delta Michigan is a Michigan nonprofit corporation located at 4100 Okemos Rd., Okemos, MI 48864, and Delta Michigan may also conduct business under the assumed names of Delta Dental of Michigan, Inc. and Delta Dental Plan of Michigan.

37.     Defendant Delta Minnesota is a Minnesota nonprofit corporation located at 500 Washington Ave. South, Minneapolis, MN 55415.

38.     Defendant Delta Missouri is a Missouri nonprofit corporation located at 12399 Gravois Rd., St. Louis, MO 63127.

39.     Defendant Delta Nebraska is a Nebraska nonprofit corporation located at 1807 N. 169th Plaza, Ste. B, Omaha, NE 68118.

40.     Defendant Delta New Hampshire is a New Hampshire corporation located at 1 Delta Drive, Concord, NH 03301.

41.     Defendant Delta New Jersey is a New Jersey corporation located at 1639 Rte. 10, Parsippany, NJ 07054.

42.     Defendant Delta New Mexico is a New Mexico nonprofit corporation located at 2500 Louisiana Blvd., NE, Ste. 600, Albuquerque, NM 87110.

43.     Defendant Delta New York is a New York nonprofit corporation located at One Delta Drive, Mechanicsburg, PA 17055.

44.     Defendant Delta North Carolina is a North Carolina nonprofit corporation located at 4242 Six Forks Drive, Raleigh, NC 27609.

45.     Defendant Delta Ohio is an Ohio nonprofit corporation located at 550 Polaris Parkway, Ste. 550, Westerville, OH 43082, and Delta Ohio also conducts business under the fictitious name of Delta Dental of Ohio, Inc.

46.     Defendant Delta Oklahoma is an Oklahoma nonprofit corporation located at 201 Robert S. Kerr Ave., Oklahoma City, OK 73102.

47.     Defendant Delta Oregon is an Oregon nonprofit corporation located at 601 SW 2nd Ave., Portland, OR 97204, and also conducts business under the assumed business names of Delta Dental of Oregon and Delta Dental Plan of Oregon.

48.     Defendant Delta Pennsylvania is a Pennsylvania nonprofit corporation located at One Delta Drive, Mechanicsburg, PA 17055.

49.     Defendant Delta Puerto Rico is a Puerto Rico for profit corporation located at 14 Calle 2 Ste. 200, Guaynabo, PR 00968.

50.     Defendant Delta Rhode Island is a Rhode Island nonprofit corporation located at 10 Charles St., Providence, RI 02903.

51.     Defendant Delta South Dakota is a South Dakota corporation located at 124 S. Euclid Ave., Floor 2, Pierre, SD 57501, and also conducts business as Delta Dental Plan of South Dakota.

52.     Defendant Delta Tennessee is a Tennessee nonprofit corporation located at 240 Ventura Circle, Nashville, TN 37228.

53.     Defendant Delta Vermont is a Vermont nonprofit corporation located at 12 Bacon St., Ste. B, Burlington, VT 05401.

54.     Defendant Delta Virginia is Virginia corporation located at 4818 Starkey Rd., Roanoke, VA 24018.

55.     Defendant Delta Washington is a Washington nonprofit corporation located at 400 Fairview Ave. North, Ste. 800, Seattle, WA 98109.

56.     Defendant Delta West Virginia is a West Virginia corporation located at One Delta Drive, Mechanicsburg, PA 17055.

57.     Defendant Delta Wisconsin is a Wisconsin nonprofit corporation located at 2801 Hoover Rd., Stevens Point, WI 54481.

58.     Defendant Delta Wyoming is a Wyoming corporation located at 6705 Faith Drive, Cheyenne, WY 82009.

## JURISDICTION AND VENUE

59.     Plaintiff brings federal antitrust claims under Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), as well

as state law claims under California's Business and Professions Code, Sections 17200, et seq. and 16720, et seq.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and 1367.

60.    This Court has personal jurisdiction over each Defendant on multiple bases, including: (a) Defendant DDIC is registered to do business in and has entered into contracts with dentists in California; (b) all of the Defendants have significant business in and contacts with California through national insurance programs, both through the provision of dental goods, services, and facilities to consumers insured by DDIC, and by allocation of territories and price-fixing as described above; (c) all Defendants are co-conspirators and are part of the same contract, combination, or conspiracy; (d) all Defendants conspired with DDPA, DDIC, and DeltaUSA; (e) all of the Defendants use standardized forms prescribed by the DDPA and/or DeltaUSA in dealing with dentists; and (f) all Defendants require dentists who are in the individual provider networks of each Plan Defendant to accept patients of the other Defendants, often without compensation for services rendered.

**INTERSTATE COMMERCE**

61.    Defendants' activities as set out in this complaint have substantially affected, and are within the flow of, interstate trade and commerce.  Many of the Delta Dental Providers provide services, goods, or facilities to persons who reside in other states.

62.    The DDPA is involved in interstate commerce.  It controls many of the operations of each of the individual Plans, serves as the mechanism for the Plans to control the marketing and use of the "Delta Dental" brand by each of the Plans, and ensures the standardization of the terms and conditions of the Delta Dental Provider Agreement that each Plan imposes on dental service providers, such as dentists, who become part of the Delta Dental network.

**FACTUAL ALLEGATIONS**

C.      **Delta Dental's Insurance Plans**

63.      The DDPA claims the Delta Dental System is the leading provider of dental insurance in the United States.

64.      The Delta Dental Plans provide a variety of dental insurance health plans.

65.      Delta Dental Premier is a traditional fee-for-service plan that allows a subscriber to visit any licensed dentist and to change dentists without first obtaining permission from Delta Dental.  Among all Delta Dental plans Premier offers the largest network of dentists, all of whom have agreed to contracted fees with Delta Dental.

66.      Delta Dental PPO ™ is a preferred provider program whose patients have access to a network of select dentists who are paid at reduced fees for covered services.

67.      DeltaCare® HMO provides low-cost dental coverage with minimal or no copayments.  The focus is on preventive care and the subscriber chooses from a fixed network of dentists.

68.      DeltaCare® USA is a prepaid plan that features set copayments, no annual deductibles, and no maximums for covered benefits.  Like the HMO plan, the focus is on preventative care and the subscriber selects a primary care dentist from the DeltaCare USA network.  Some Plans offer DeltaCare USA as an open-access plan where enrollees can obtain treatment from any licensed dentist; however, deductibles and maximums may be applied to out-of-network treatment.

69.      Delta Dental Patient Direct, rather than being a dental insurance plan, allows the subscriber to obtain discounts on dental services, where the subscriber chooses from a panel of participating dentists who charge discounted fees.  The subscriber pays these fees to the dentist at the time of treatment.

70.     Delta Dental PPO Plus Premier combines the Delta Dental PPO and Premier networks. "With this plan, even if your Delta Dental Premier dentist is not in the PPO network, you still receive the benefit of that dentist's contracted fee."[3]

71.     There is a special plan for members of the American Association of Retired Persons ("AARP ®").

72.     Delta Dental's website provides the following description of which Plans provide these various services:

> Delta Dental of California offers and administers Delta Dental PPO™ and other fee-for-service dental programs for groups headquartered in the state of California.

> Delta Dental of New York offers and administers Delta Dental PPO and other fee-for-service programs in New York.

> Delta Dental of Pennsylvania and its affiliates offer and administer Delta Dental PPO and other fee-for-service dental programs in Delaware (Delta Dental of Delaware), Maryland, Pennsylvania, West Virginia (Delta Dental of West Virginia), and the District of Columbia (Delta Dental of the District of Columbia).

> Delta Dental Insurance Company offers and administers Delta Dental PPO and other fee-for-service dental programs to groups headquartered or located in Alabama, Florida, Georgia, Louisiana, Mississippi, Montana, Nevada and Utah, and vision programs to groups headquartered in West Virginia. In Texas, Delta Dental Insurance Company offers and administers fee-for-service dental programs and provides a dental provider organization (DPO) plan.

> DeltaCare® USA is underwritten in these states by these entities: AL — Alpha Dental of Alabama, Inc.; AZ — Alpha Dental of Arizona, Inc.; CA — Delta Dental of California; AR, CO, IA, MA, ME, MI, MN, NC, ND, NE, NH, OK, OR, RI, SC, SD, VA, VT, WA, WI, WY — Dentegra Insurance Company; AK, CT, DC, DE, FL, GA, KS, LA, MS, MT, TN, WV — Delta Dental Insurance Company; HI, ID, IL, IN, KY, MD, MO, NJ, OH, TX — Alpha Dental Programs, Inc.; NV — Alpha Dental of Nevada, Inc.; UT — Alpha Dental of Utah, Inc.;

---

[3] Delta Dental, https://www.deltadental.com/us/en/shop-for-insurance/dental-plans.html (last visited Dec. 12, 2019).

NM — Alpha Dental of New Mexico, Inc.; NY — Delta Dental of New York, Inc.; PA — Delta Dental of Pennsylvania. Delta Dental Insurance Company acts as the DeltaCare USA administrator in all these states. These companies are financially responsible for their own products.

The AARP® Dental Insurance Plan is insured by Delta Dental Insurance Company (Contract 1230) in AK, AL, DC, DE, FL, GA, LA, MD, MS, MT, NV, NY, PA, PR, TN, TX, UT, VI and WV, by Dentegra Insurance Company (Contract 1230) in AR, AZ, CA, CO, CT, HI, IA, ID, IL, IN, KS, KY, ME, MI, MN, MO, NC, ND, NE, NH, NJ, NM, OH, OK, OR, RI, SC, SD, VA, VT, WA, WI, and WY and by Dentegra Insurance Company of New England (Contract 1230) in MA. The plan is administered by Delta Dental Insurance Company. For Texas residents your Master Policy Form number is TX-AMDMC- DPO-D-DC(DELTAUSA1-2005). These companies are financially responsible for their own products.[4]

73.      As can be seen from the aforementioned descriptions, while Delta Dental Plans operate individually in various states and territories, they offer a common set of dental insurance programs.

D.      **The Development of the Delta Dental System: Independent Companies and an Association**

74.      The original Delta Dental Plans were founded in California, Washington, and Oregon in 1955 as dental service organizations primarily to provide dental care for the families of longshoremen.  Delta Dental rapidly grew, and by 1966 the DDPA was formed to "coordinate dental insurance for companies with employees in multiple states."[5]

---

[4] Delta Dental, *Who We Are*, https://www.deltadentalins.com/about/legal/who-we-are.html (last visited Dec. 12, 2019).

[5] Delta Dental, https://www.deltadental.com/us/en/about-us.html (last visited Dec. 12, 2019).

75.     The Delta Dental System continued to grow, and is now the leading dental care insurer in the United States.  One in three Americans with dental insurance is insured through Delta Dental, totaling over 80 million people.  Three out of every four dentists in America are part of the Delta Dental System.

76.     The DDPA is an association of independent Delta Dental Plans, who are members of, and govern, the DDPA.

77.     The DDPA is entirely and directly controlled by its member Plans, all of whom are independent dental insurance companies or an affiliate of those companies.

78.     The Plans control the Board of Directors of the DDPA.

79.     The DDPA promotes this group of independent companies as a single provider— "Delta Dental."

80.     The DDPA is an instrument of the Delta Dental Plans.  The Board members of DDPA are elected by the member Plans.  DDPA Board members are officers of the member Plans. The Plans vote on any major actions of the DDPA initiated by the Board of Directors, all exhibiting the Plans' direct control over the DDPA.

81.     The Delta Dental System sought to further foster coordination and share information with the formation of Renaissance Systems & Services in the early 2000's, which was created to promote system-wide e-commerce.  In 2005, the Plans created "[t]he Research and Data Institute . . . [t]he institute accesses and analyzes the organization's massive data warehouse, which contains the world's largest collection of dental claims data." Crucially, these organizations allowed the DDPA, under the direction of the Delta Plans, to ensure that all Delta Plans were compliant with the market allocation scheme.

E.     **Defendants' Market Allocation Scheme**

82.     Defendants have entered into a "contract, combination or conspiracy" to provide dental insurance under the "Delta Dental" brand in exclusive territories.

83.     Although the Defendant Plans do not compete with each other using the "Delta Dental" brand in any states or territories and have never done so since the Delta Dental organization was created, the independent Plans are potential competitors.

84.     The DDPA is an association of the 39 independent Delta Dental Plans.

85.     As noted above, the DDPA is entirely controlled by its member Plans, all of whom are independent dental insurance companies or an affiliate of those companies.  DDPA reported in on a 2017 Form 990 filed with the Internal Revenue Service that "members have the power (A) to approve amendments to the organization's articles of incorporation, bylaws and the membership standards portion of the membership standards and guidelines adopted by the members . . . and (C) to elect and remove the organization's Board of Directors."

86.     The Plans have used their control over the DDPA to coordinate their activities.  Each Plan entered into a licensing agreement with the DDPA, and Defendants used these agreements to restrain competition through a market allocation scheme.  As part of those licensing agreements, the member must follow membership standards, which are instituted and changed upon a vote by the member Plans.

87.     The territorial restraints imposed upon Delta Dental Plans are nationwide.  The license agreements limit each Plan to compete on a branded basis only in its own state or region.  Thus, each Plan is only licensed to provide "Delta Dental" branded dental insurance in a single state or region and cannot operate outside the region using the "Delta Dental" name.

88.     Through the license agreements and the DDPA, which the Plans create and control, each Defendant agrees that the Plans will not compete under the "Delta Dental" trademarks and

trade names outside of their designated territory, and they will report no revenue received from other regions.  Some, like DDIC, operate in multiple states, but use unique "DBAs" to operate in each of those states.  Those separate entities are licensed to do business only in particular regions, do not compete outside the borders of those regions, and report no revenue from other regions.

89.    Each licensee from the DDPA is an independent company or legal entity.  The territorial allocation imposed by the DDPA through these licenses is a territorial allocation that the Plans have imposed upon themselves to restrict competition.

90.    The Plans elect the DDPA Board of Directors (which appoints the officers of the DDPA) and vote on any major actions by the DDPA, so any agreement between the DDPA and its member plans constitutes a horizontal agreement between and among the Plans themselves.

91.    The Plans have agreed through the DDPA license agreement to operate only in specific territories in which they are authorized to operate.

92.    DDPA informed the WIPO Arbitration and Mediation Center: "its business is operated through 39 member companies" that are "licensed to offer services under the DELTA DENTAL mark in specific regions of the US. Each company has to use the mark in its company or legal trading name together with a geographic indicator describing its territory.  In addition, each member must register a URL incorporating the DELTA or DELTA DENTAL trade names together with a geographic indicator."

93.    The Delta Dental Plans' annual statements to state insurance departments confirm that insurance premiums are "Allocated by States and Territories."  Additionally, the statements also confirm that each Defendant obtains revenues exclusively from its allocated territories.  For example, Delta California reports revenue only from California.

94.    A number of the Defendant Plans have formed affiliations of inter-related business entities, further entrenching the use of exclusive territories.  For example, Dentegra Group, Inc.

1   ("DGI") is a holding company for Delta California and other entities.  A 2017 Delaware

2   Department of Insurance Examiner's Report on DGI and its wholly-owned subsidiary, Dentegra

3   Insurance Company, contained a chart of the "Insurance Holding Company System of Delta

4   California," and is excerpted below:



As shown, beyond Delta California and Delta Pennsylvania, some of the entities under the DGI

umbrella are: (a) Plans operated in Alabama, Georgia, Louisiana, Mississippi, Montana, Nevada,

Texas, and Utah by DDIC, and (b) Plans operating in or near the Eastern part of the United States (Delta District of Columbia, Delta Puerto Rico, Delta Delaware, Delta New York, and Delta West Virginia).

95.     Despite being geographically close and potentially capable of gaining valuable new business, Delta District of Columbia, Delta Delaware, and Delta West Virginia will never be able to sell insurance into Pennsylvania.  Similarly, DDIC, which falls under the DGI umbrella, reportedly serves the markets of Alabama, Florida, Georgia, Louisiana, Mississippi, Montana, Nevada, Texas, and Utah.  DDIC does not permit other Plans under the DGI umbrella to compete freely and directly with it in those States, because all of those companies now purport to function as part of the DGI "enterprise structure."  In a truly competitive world, it is inconceivable that a company like Delta California, constantly searching for "fresh markets," would not have invaded other states.  Delta California refrained from doing so because of the DDPA's policies of territorial allocation.

96.     The DGI family of Plans has publicly admitted Defendants' illegal territorial allocation.  DGI depicts its operations on its website with this map:

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1
2
3
4
5
6
7
8
9
10



11
12

The website states:

> Delta Dental of California, Delta Dental of Pennsylvania, Delta Dental of New York, Inc., and Delta Dental Insurance Company, together with their affiliate companies, form one of the largest dental benefits delivery systems in the country.  We provide dental benefits plans in 15 states, the District of Columbia, Puerto Rico and the Virgin Islands.  Our group of companies and affiliates are members of the Delta Dental Plans Association, a network of 39 independent Delta Dental member companies. This gives our enrollees access to some of the largest dentist networks nationwide.[6]

13
14
15
16
17

97.     Renaissance Health Service Corporation ("Renaissance Health") is another holding company that wholly or partly owns or controls a number of Delta Plans.  A New York State Department of Financial Services Examiner's Report issued in February of 2018 about one of Renaissance Health's subsidiaries, the Renaissance Health Insurance Company of New York, included the following organizational chart illustrating the holdings of Renaissance Health:

18
19
20
21
22
23
24
25
26
27
28

---

[6] Delta Dental, https://www.deltadentalins.com/about/corporate-profile.html (last visited Dec. 12, 2019).



98.    DDPA directly encouraged these affiliations of "independent Delta Dental member companies."  As the DDPA stated in a 2015 Form 990 filed with the Internal Revenue ("IRS"):

THE ORGANIZATION HAS TWO CLASSES OF MEMBERSHIP - ACTIVE AND AFFILIATE  ANY DENTAL SERVICE CORPORATION THAT IS ACTIVELY ENGAGED IN ADMINISTERING A PREPAYMENT PROGRAM OR PROGRAMS IS ELIGIBLE FOR ACTIVE MEMBERSHIP  THE TERM "DENTAL SERVICES CORPORATION" MEANS ANY NOT-FOR-PROFIT CORPORATION ORGANIZED PRINCIPALLY TO PROVIDE DENTAL HEALTH CARE SERVICES BY MEANS OF CONTRACTS WITH DENTISTS  TO BE ELIGIBLE FOR AFFILIATE MEMBERSHIP, AN ORGANIZATION MUST BE (I) A NOT-FOR-PROFIT DENTAL CARE COMPANY THAT IS LOCATED OUTSIDE THE UNITED STATES, ITS TERRITORIES AND POSSESSIONS, OR (II) A CORPORATION, WHICH MAY BE A FOR-PROFIT CORPORATION (AND INCLUDING ANY ENTITY LOCATED OUTSIDE THE UNITED STATES, ITS TERRITORIES AND POSSESSIONS), WHICH DESIRES TO COOPERATE WITH THE ORGANIZATION AND/OR ITS AFFILIATES IN PROVIDING DENTAL PREPAYMENT PROGRAMS TO THE PUBLIC  AN ORGANIZATION WISHING TO BECOME A MEMBER MUST APPLY AND BE APPROVED FOR MEMBERSHIP  MEMBERS MAINTAIN THEIR MEMBER STATUS BY PAYING ANNUAL DUES AND ASSESSMENTS AND COMPLYING WITH THE ORGANIZATION'S MEMBERSHIP STANDARDS AND OTHER REQUIREMENTS  THE MEMBERS HAVE THE POWER (A) TO APPROVE AMENDMENTS TO THE ORGANIZATION'S ARTICLES OF INCORPORATION, BYLAWS AND THE MEMBERSHIP STANDARDS PORTION OF THE MEMBERSHIP STANDARDS AND GUIDELINES ADOPTED BY THE MEMBERS, (B) TO SET AND REVISE ANNUAL DUES, AND (C) TO ELECT AND REMOVE THE ORGANIZATION'S BOARD OF DIRECTORS

Under this approach, all members must "comply[] with the organization's membership standards and other requirements."  Ultimately, companies cannot become members of DDPA unless they abide by DDPA's standards and requirements.

99.    Any efforts by a Plan using the "Delta Dental" brand to branch out of its territory and seek the business of an employer or group in another state would have been out of compliance with the membership standards.

100.    This restriction on competition enforced by the DDPA and implemented by its members and their affiliates is not in the individual self-interest of each Plan, as it limits each Plan's ability to grow and increase output, and effectively shackles it as a competitor.

F.    **Defendants' Joint Anticompetitive Compensation of Dentists**

101.    Defendants' market allocation scheme, with the resulting reduction in competition for Defendant Plans, has allowed Defendants to build a dominant market share for dental insurance nationwide.  Defendants wield their considerable market power by compelling dentists to accept below-market reimbursement terms for the provision of dental services.

102.    These reimbursement terms do not fairly compensate dentists for those services. Defendants can compel dentists to accept these terms through standardized provider service

contracts that are offered on a "take it or leave it" basis, with no room for negotiation, and with complete control of rates and terms.

103.    If Delta Dental Plans could compete with each other in the territories in which other Delta Dental Plans operate, the resulting competition would provide dentists with more opportunities to receive fairer compensation.

104.    The fee agreements between Delta Dental and dentists are non-negotiable.  Delta California's sample form provider agreement provides an example of such an agreement:

**2. Basis of Fees.** A participating dentist will accept his or her "Contracted Fees"* fees with Delta Dental as full payment for services provided to any eligible patient.* If the participating dentist does not have a Contracted Fee with Delta Dental for a particular procedure submitted on an Attending Dentist's Statement, payment will be based on a maximum amount as determined by Delta Dental applying the same factors used for Contracted Fees.

The term "Contracted Fee" is defined in this sample agreement as follows:

"Contracted Fee" means the fee for each Single Procedure that a participating dentist has contractually agreed with Delta Dental to accept as payment in full for treating Enrollees.

The "Contracted Fee" will be subject to a maximum amount allowed as determined by Delta Dental for the network, specialty and location in which the dentist participates. The maximum amount is based on an actuarial calculation, and taking into account filed fees, general inflation rates, health care inflation rates, market pricing by competitors, and acceptability by customers. The maximum amount will not be reduced unless participating dentists' filed or submitted fees decrease to such an extent that Delta Dental is warranted in reducing the maximum amount allowed.

105.    Other Delta Dental provider contracts contain similar, non-negotiable fee clauses.

106.    The Delta Virginia PPO form provider agreement states that "[i]n our Delta Dental PPO program, we base our payments on Dental PPO Allowances.  You agree to accept Delta Dental PPO Allowances as payment in full for Covered Benefits that you provide to Delta Dental PPO Enrollees."  Similarly, the standard agreement for dentists in the Delta Colorado Premier network states that "[t]he Corporation agrees to compensate the Dentist for covered benefits in the following manner.  The submitted charge for any covered service will be compared to the Maximum Plan Allowance (the allowable amount as determined by Delta Dental for a procedure). The lesser of the submitted charge or the Delta Dental Maximum Plan Allowance will be used to compute the patient copayment and compensation due to the Dentist from Corporation."

107.    Likewise, the Delta Rhode Island provider agreement states that "[t]he Dentist shall be compensated for the provision of Covered Services in accordance with (i) the compensation arrangements established by Delta Dental from time to time; and (ii) the terms and conditions of the agreements entered into from time to time by Delta Dental or other Qualified Entities regarding provision of dental services to covered persons."

108.    Further, the Delta North Carolina PPO Provider Agreement states:

> Delta North Carolina herein agrees to pay me for each commonly performed procedure performed by me to an eligible Delta North Carolina Subscriber in accordance herewith and covered by such subscriber's agreement with Delta North Carolina an amount equal to the Maximum Plan Allowance as established by Delta North Carolina and incorporated by reference herein, which fees may be amended from time to time by Delta North Carolina in its sole discretion.

109.    Among the unilateral and unfair pricing practices in which Defendants have recently engaged, Delta Dental Plans have imposed a series of onerous reimbursement fee cuts on dental providers in its network.

110.     For example, on June 15, 2011, WDS—the predecessor entity of Delta Washington—reduced dentist compensation by 15% for providers in the Delta Dental Premier network and 5% for those in the Delta Dental PPO network.

111.     When dentists complained, WDS's CEO, Jim Dwyer ("Dwyer"), remarked that they should just work harder.  Meanwhile, by 2013, WDS's cash investments had reached $234 million and its premium revenues exceeded $1 billion.  Aggregate compensation for Delta Washington Board members (excluding Dwyer) increased from $677,000 in 2015 to $1.28 million in 2016; accordingly, Dwyer's compensation increased to $2.7 million in 2016, compared to $1.1 million in 2011.

112.     Drastic rate decreases were becoming more frequent in Delta Plans across the nation.

113.     In 2011, Delta Idaho reduced dental reimbursement fees between 4% and 13%; in June of 2012, New Jersey and Connecticut Plans engaged in similar reductions.  Thereafter, Delta Missouri cut dentist reimbursements in Missouri by an average of 7% and the Plans in New Hampshire and Vermont implemented 4% rate cuts.

114.     Likewise, in August of 2013, Delta California declined to calculate maximum reimbursement rates under its contract for Premier Plans "based on actuarial calculation, and taking into account filed fees, health care inflation rates, market pricing by competitors, and acceptability by customers."  Instead, Delta California continued to use fees that were in place as of January 1, 2011—over two years earlier—as the maximum allowable fee.

115.     This unilateral change in policy was followed by Delta California's elimination of language their dental service provider contracts that Delta California would only lower its maximum amount payable if "participating dentists filed or submitted fees decrease to such an extent that Delta is warranted in reducing the maximum amount allowed."

116.    In Massachusetts, beginning in 1990, Delta Massachusetts had used a Consumer Price Index ("CPI") in calculating fees for dentists who provided services pursuant to its Delta Premier network. Affected dentists challenged those fees before the Massachusetts Department of Insurance ("MDOI"). In an opinion issued in April of 2009, the MDOI condemned this fee methodology and ordered Delta Massachusetts to replace it. The Hearing Examiner stated:

> Delta has not justified why the cost to an urban consumer of purchasing a basket of goods and services on a retail basis constitutes a reasonable basis upon which to cap reimbursements of Premier participating dentists. Delta has not demonstrated that its CPI reflects a Massachusetts dentist's cost of doing business. I am not persuaded that these costs are tracked or mirrored by the consumer price index that Delta employs.

> In part, Delta defends its CPI adjustment because the prices charged for dental services are included in its CPI under the category of medical care. Delta, however, rejects the use of the "dental CPI" for its adjustment, dismissing it as merely an index of what dentists charge. The inclusion of retail dental charges in Delta's CPI is no justification for its use, for the same reason that Delta rejects use of the "dental CPI." Justifying Premier's use of its CPI because it includes dental charges for the region, furthermore, creates an intellectual anomaly. Delta already collects Massachusetts-specific information about the prices at which dental services are billed when it collects the data on which Premier's "customary fees" are based. Unlike Delta's CPI, the "customary fees" are based specifically on the charges submitted to Delta by Massachusetts dentists (their "usual fees"). Delta has not explained why it is reasonable to cap dental reimbursements to Massachusetts dentists by reference to a CPI that contains within it dental charges made by dentists in several states, when Massachusetts-specific data has been collected.

> ****

> Another problem with Delta's CPI adjustment is that, if the CPI-driven nature of the April 1, 2008, periodic update is duplicated for several periodic updates *ad seriatim*, the "customary maximum allowable fee" for a procedure will lag further and further behind the amount that lies at the 90th percentile of participating dentists' "usual fees" for that procedure. Over years of updates, the "customary" aspect of Premier's fee methodology would depart, for the vast majority of dental procedures, further and further from the reality of the 90th percentile at which Massachusetts dentists usually are charging their nonsubscriber patients. A fee methodology with such a dramatic disconnect is inherently unreasonable.

117.    Soon after MDOI's finding that their fee structure was unjustifiable, Delta Massachusetts released a revised fee methodology for both Premier and PPO plans.  Dentists, arguing that this new fee structure was once again an unacceptable method of capping fees, challenged the new fee methodology.  A Hearing Examiner for MDOI once again determined that the bases for the new methodology were inappropriate.  Delta Massachusetts eventually adopted a fee methodology based on a consumer price index specifically applicable to dental services (the "Dental CPI").

118.    Then in 2016, Delta Massachusetts introduced Total Choice, a new PPO product that reimbursed dentists at about 25% to 30% less than they received under the then-current Premier Plan.  Ellen Factor, director of dental practice and membership engagement services for the Massachusetts Dental Society, stated that "this PPO product was communicated to dentists with very short notice and caused considerable concern for dentists, employers and legislators."  With the possibility of leaving some of their patients without coverage for procedures, the dentists in Massachusetts were forced to accept this new product offering.  As noted in an October 2017 article published in the Worcester Business Journal:

> Dentists complained to the Legislature on Monday that they felt coerced into joining Delta Dental's new, lower-cost insurance plan, called Total Choice, and they asked lawmakers to impose more government control over the dental benefits giant.

> Last year, Delta told dentists it was offering a new plan through a for-profit subsidiary of the non-profit parent and initially gave them about a month to sign onto the new network or face a "one-year lockout," Massachusetts Dental Society President David Lustbader told lawmakers.

> Because of Delta's market share, dentists felt they had little choice but to join the Total Choice Preferred Provider Organization (PPO), and the lower rates paid to dentists under the plan have forced them to weigh tough business decisions, they told the Committee on Financial Services.

1
2
3

> Lindi Ezekowitz, a pediatric dentist in Newburyport, said she couldn't afford to continue accepting both MassHealth patients and Total Choice PPO patients, so she no longer accepts Total Choice. Patients with that plan who choose to still see her must pay in full out of their own pockets.

4
5

> "Those patients are suffering," Ezekowitz told the committee.

6
7
8
9
10

119.    In July of 2019, Delta Massachusetts revised its fee methodology for Delta Dental Premier and Delta Dental PPO; it abandoned the use of the Dental CPI and announced that fees to providers would be reduced by 8.8% for non-incentive/standard fee schedule rates.   When multiple dentists announced they would have to drop out of the Delta Dental network because of these rate cuts, Delta Massachusetts sent a letter to the patients of those dentists saying, in part:

11
12
13
14
15
16
17
18
19

> I want you to know that [Dentist Name] at [location] will no longer be a member of the Delta Dental® networks. This change will happen on September 30, 2019. This means you and your family may pay more to get care with this dentist after September 30. Where you get your care is your choice. With Delta Dental, you have many options. You can stay with your current dentist. Just keep in mind that because he or she isn't in our network at this location anymore, your costs will likely be higher. You may also be asked to pay up front for your visit, and you may have to submit your own claims for reimbursement. If you want to stay with this dentist, ask if he or she is part of the Delta Dental networks at a different dentist office location. The good news is that nearly every other dentist in the state is in our networks. This means you should be able to find a number of Delta Dental dentists near your home, school, or work.

20
21

120.    As Janis Moriarty, president of the Massachusetts Dental Society, explained in an article recently published in Dentistry Today, the letters were misleading:

22
23
24

> Delta's letter to patients is putting providers in an unfair and unfortunate position with respect to their patients by sending communications that are incomplete, and therefore misleading, and intrusive of the dentist-patient relationship.

25
26
27
28

> Delta's letter informs patients that their dentist is no longer a member of the Delta network without any explanation as to why, but the why is relevant. The letter also warns patients that they may be asked to pay up front and pay out of pocket for treatment. Delta, of course, has imposed this burden on patients by disallowing the assignment of benefits. The MDS will continue to have discussions with Delta

CLASS ACTION COMPLAINT                                                        28
78644

regarding the importance of adding assignment of benefits contract provisions to all its programs.

121.    Thomas O'Rourke, head of corporate communications at Delta Massachusetts, asserted that its misleading letter was fully justified:

> We greatly value our relationships with providers and members. When dentists choose to discontinue their participation in our network, we have an obligation to inform our members, particularly when that change could result in a change in coverage or an increase in out-of-pocket costs. The goal of these letters is to ensure that our members have the information they need to make the best care decisions for themselves and their family members and to give them the information they need if they want to make a change.

122.    In an effort to minimize reimbursements to dentists, the Plans have encouraged Delta Dental Premier Plan customers to convert to the Delta Dental PPO plan.  Under the Delta Dental PPO Plan, reimbursement rates are not tethered to a dynamic Dental CPI or other types of index; instead, the Provider Agreement under the PPO plan sets forth fixed compensation rates for specified dental services.  As Delta Dental has explained, "participating dentists agree to scheduled fees as payment in full."

123.    Those reimbursement rates do not change rapidly as a general matter and can stay in place for years, notwithstanding the cost of providing services (equipment, materials, labor, etc.) continually rising.  Any gap between the fixed Delta Dental PPO reimbursement rate and a dentist's usual and customary rate for the service in question has to be written off by the dentist.  In a Delta Dental PPO, it is in the interests of the relevant Delta Dental Plan to contain costs by encouraging dentists to forego some services.

124.    The impact of Delta Dental's effort to minimize dentist reimbursement has been severe.  The American Dental Association ("ADA") has developed research which shows that dentists' average, inflation-adjusted net income from 2001–18 has declined significantly, due in

large part to the anticompetitive conduct of Defendants. This decline is demonstrated in the below chronology:



125.    The figures on the chart, depicting the national average annual income for dentists, tend to mask the disparities at a state by state level.  The following map, also from the ADA, shows average annual incomes by state for general dentists in 2018, which are sometimes significantly lower than the national average of $190,440.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18      126.    While dentists' incomes have decreased, mandatory education, dental tools, and

19  resulting debt have increased during this time.

20      127.    The decline in dental reimbursements that have squeezed dentists' earning ability is

21

22  shown on a state-by-state level in the following ADA chart:

23
24
25
26
27
28



128.   All of this constitutes antitrust injury to members of the proposed Class.

129.   The declining income for dentists starkly contrasts with the salaries and benefits given to executives and directors of the ostensibly "not for profit" Delta Plans.

130.   For example, based on its Form 990 filed with the IRS in 2016, Delta California's CEO was paid significantly more than his counterparts at much larger for profit, and not for profit, companies:

### CEO Total Compensation, 2016

| | |
|---|---|
| Apple<br>(116K employees, revenues of $216B) | $8.7 million |
| Anthem<br>(53K employees, revenues of $85B) | $13.6 million |
| Delta Dental of CA<br>(2K employees, revenues of $6B) | $14.3 million |

Sources: Delta Dental IRS Form 990, Apple and Anthem proxy statements.

131.   Likewise, Delta California spent $54 million in compensating its executives and Board of Directors in 2016, which constituted over one-fifth of total pay to company personnel, a percentage far exceeding other health-related companies:

### Exec & Director Pay as % of Total Personnel Costs

| | |
|---|---|
| Delta Dental of CA<br>(2K employees, $54M executive & director pay) | 21.0% |
| Blue Cross Blue Shield of MA<br>(4.1 employees, $13M executive & director pay) | 4.4% |
| Geisinger Health Plan<br>(1.5K employees, $4M executive & director pay) | 3.6% |

Sources: IRS Forms 990 for 2016, Part 1, Line 5 & Part IX, Lines 5 & 7

132.   Additionally, Delta California's executives received numerous other expensive executive perks:

**Delta Dental Executive Perks Reported on IRS Form 990**

| | | | |
|---|---|---|---|
| ✔ | First class or charter travel | ✔ | Housing allowance or residence for personal use |
| ✔ | Travel for companions | | Payments for business use of residence |
| ✔ | Tax indemnification and gross up payments | ✔ | Health or social club dues or initiation fees |
| | Discretionary spending account | ✔ | Personal services (e.g., maid, chauffer, chef) |

133.    The former CEO of Delta Washington, Jim Dwyer, is another example of the marked contrast between dentist reimbursement and Delta Dental executive salaries. Mr. Dwyer was already highly paid as of 2013 yet he received a raise of $766,943 in 2016.  Members of Delta Washington's Board, who work between seven and twelve hours a week, also got healthy raises: the then-board chair, Douglas Beck, got a raise from $96,732 in 2015 to $154,573 in 2016, despite working an average of eleven hours per week.  In 2016, total executive and board compensation for Delta Washington was about $10 million.

134.    Delta Massachusetts likewise paid its executives at a higher rate than other not for profit healthcare companies.  A June 2017 article in the Boston Globe reported as follows:

> In 2015, the last year for which tax filings are available, eight executives at Delta Dental's parent company earned more than $1 million in total compensation, up from just one in 2011. Total compensation includes base salary, bonuses, and retirement benefits.
>
> By comparison, Blue Cross Blue Shield of Massachusetts, which has eight times the revenues, reported total compensation of at least $1 million for seven executives in 2015, including almost $2.9 million for chief executive Andrew Dreyfus. The pay packages at Delta's parent company were also more generous than at Harvard Pilgrim Health Care and Tufts Health Plan, two other nonprofit insurers.
>
> Delta's top earner in 2015 was the former president, Fay Donohue, who received more than $7 million in total compensation despite working just a few months before retiring that year; much of that sum came in the form of retirement benefits and was previously reported in tax filings.

> Others who earned seven figures that year included Steven J. Pollock, who took over as president midyear and earned $2.4 million in total compensation, and Sheryl Traylor, senior vice president of human resources, who earned $2.6 million.

135.    All of the foregoing indicates that Delta Dental Plans are profiting extensively at the expense of dental care providers in the Delta Dental Network.

## CLASS ACTION ALLEGATIONS

136.    Plaintiff brings this action on his own behalf and on behalf of a nationwide injunctive class under Rule 23(a) and Rule 23 (b)(2) of the Federal Rules of Civil Procedure, and seeks injunctive relief on behalf of the following class (the "Injunction Class"):

> All Delta Dental Providers, not owned or employed by any of the Defendants, that provide dental goods or services to Delta Dental insureds pursuant to a Delta Dental insurance policy within the United States and its territories.

137.    Plaintiff also brings this action on behalf of himself and as a class action under Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure, and seeks monetary damages on behalf of the following California class (the "California Class"):

> All Delta Dental providers in the State of California, not owned or employed by any of the Defendants, that provided dental goods or services to a Delta Dental insured pursuant to a Delta Dental insurance policy within the State of California and within four years of the date of filing of this action.

138.    These two Classes will be referred to collectively herein as the "Class."

139.    Plaintiff believes there are thousands of members of the Class, the exact number and their identities being known by Delta Dental, making Class members so

numerous and geographically dispersed that joinder of all members is impracticable.

140.    There are numerous questions of law and fact common to each Class member, including, but not limited to:

a.    Whether the conduct of Defendants alleged in this complaint constituted an unlawful market allocation in violation of Sections 1 and 3 of the Sherman Act;

b.    Whether the conduct of Defendants alleged in this complaint constituted unlawful price-fixing in violation of Sections 1 and 3 of the Sherman Act;

c.    Whether the conduct of Defendants alleged in this complaint caused damages to Provider Plaintiffs and other members of the Class and the amount and extent of those damages; and

d.    Whether the conduct of Defendants alleged in this complaint is ongoing and should be enjoined.

141.    Plaintiff is a member of the Class, has claims that are typical of the claims of the Class members, has interests coincident with and not antagonistic to those of the other members of the Class, and will fairly and adequately protect the interests of the members of the Class.

142.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

143.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

144.    A class action is superior to other available methods for the fair and efficient

adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender. The Class is readily definable and is one for which records should exist in the files of DDPA and/or the Plans or others, and a class action will eliminate the possibility of repetitious litigation.

145.    Class treatment will also permit the adjudication of relatively small claims by many members of the Class who otherwise could not afford to litigate claims such as those asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## CAUSES OF ACTION

## COUNT ONE – FOR INJUNCTIVE RELIEF ON BEHALF OF THE INJUNCTIVE CLASS UNDER THE CLAYTON ACT

146.    plaintiff incorporates the allegations set forth in the foregoing paragraphs as though set forth herein.

147.    This is a claim for nationwide injunctive relief under section 16 of the clayton act (15 U.S.C. § 26) brought by plaintiff and on behalf of all delta dental providers, not owned or employed by any of the defendants, that provide dental goods or services to delta dental insureds pursuant to a delta dental insurance policy within the united states and its territories.

148.    Defendants' concerted acts of market allocation, output restraint and suppression of compensation as described herein constitute *per se* violations of sections one and three of the Sherman Act (15 U.S.C. §§ 1, 3), or at least, are subject to a "quick look" rule of reason analysis.

149.    Defendants' unlawful conduct threatens to continue to injure plaintiff and members of the injunction class.  Plaintiff seeks a permanent injunction prohibiting defendants and all others

acting in concert from continuing their illegal contract, combination, or conspiracy and ordering

them to take appropriate remedial action to correct and eliminate any remaining effects of their

illegal contract, combination, or conspiracy.

150.    Plaintiff reserves the right to seek preliminary injunctions as necessary.

**COUNT TWO – FOR INJUNCTIVE RELIEF ON BEHALF OF THE CALIFORNIA CLASS UNDER CALIFORNIA'S UNFAIR COMPETITION LAW, CALIFORNIA BUSINESS AND PROFESSIONS CODE, SECTION 17203, AND THE CARTWRIGHT ACT, CALIFORNIA BUSINESS AND PROFESSIONS CODE, SECTION 16750(A).**

151.    Plaintiff incorporates the allegations set forth in the foregoing paragraphs as though

set forth herein. the claim presented in this count is presented as an alternative to the claim

advanced in count one.

152.    This is a claim for nationwide injunctive relief, restitution, disgorgement, attorney

fees and costs pursuant to the California Business and Professions Code, Section 17203, and for

injunctive relief under the California Business and Professions Code, Section 16750(a) on behalf

all Delta Dental providers in the state of California, who are not owned or employed by any of the

defendants, that provided dental goods or services to a Delta Dental insured pursuant to a Celta

Dental insurance policy within the state of California within four years of the date of filing of this

action. As alleged more specifically above, defendants have engaged in a market allocation scheme

and price-fixing that constitute a common continuous and continuing course of conduct of unfair

competition by means of unfair, unlawful and/or fraudulent business acts or practices within the

meaning of California Business and Professions Code, Section 17200, et seq., including, but not

limited to, the violations of California Business and Professions Code, Section 16720, et. seq. (the

"cartwright act").

153.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as

described above, whether or not in violation of Sections 16720 and 16726 of the California

Business and Professions Code, and whether or not concerted or independent acts, are otherwise

unfair, unconscionable, unlawful or fraudulent; defendants' acts and practices are unfair to delta

dental providers in the state of California, who are not owned or employed by any of the

defendants, that provided dental goods or services to a Delta Dental insured pursuant to a Delta

Dental insurance policy within the state of California within four years of the date of filing of this

action.

154.    Defendants' unlawful conduct threatens to continue to injure plaintiff and members

of the California class.  Plaintiff seeks a permanent injunction prohibiting defendants and all others

acting in concert from continuing their illegal contract, combination, or conspiracy and ordering

them to take appropriate remedial action to correct and eliminate any remaining effects of their

illegal actions.

155.    Defendants and their co-conspirators have caused injury to the plaintiff and the

California class members as a result of their wrongful conduct and defendant's unfair competition,

as described above.  The plaintiff and the members of the California class are accordingly entitled

to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits,

compensation and benefits which may have been obtained by defendants as a result of such

business practices, pursuant to California Business & Professions Code §§ 16750(a) and 17203.

156.    Plaintiff reserves the right to seek preliminary injunctions as necessary.

**COUNT THREE – FOR MONETARY DAMAGES ON BEHALF OF THE CALIFORNIA CLASS UNDER THE CLAYTON ACT**

157.    Plaintiff incorporates the allegations set forth in the foregoing paragraphs as though

set forth herein.

158.    Plaintiff brings this claim under Section Four of the Clayton Act (15 U.S.C. § 15)

for treble damages and interest on behalf of all Delta Dental providers in the State of California,

who are not owned or employed by any of the Defendants, that provided dental goods or services

1    to a Delta Dental insured pursuant to a Delta Dental insurance policy within the State of California

2    within four years of the date of filing of this action.

3        159.    As alleged more specifically above, Defendants have engaged in a market allocation

4    and price-fixing scheme that constitutes a contract, combination, and conspiracy in restraint of

5    trade within the meaning of Sections One and Three of the Sherman Act (15 U.S.C §§ 1, 3).

6        160.    Defendants have agreed to divide and allocate the geographic markets for the

7    provision of dental insurance into a series of exclusive territories for each of the Plans. In doing so,

8    Defendants have entered into an illegal agreement that suppresses competition and reduces

9    compensation to dental Providers in violation of Sections One and Three of the Sherman Act.

10   Defendants' anticompetitive acts are illegal *per se* under Sections One and Three of the Sherman

11   Act or are subject to a "quick look" rule of reason analysis.

12       161.    As a direct and proximate result of Defendants' continuing violations of Sections

13   One and Three of the Sherman Act, Plaintiff and absent California Class members have suffered

14   and continue to suffer injury and damages of the type that the federal antitrust laws were designed

15   to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These

16   damages consist of having been paid less, having been forced to accept far less favorable rates and

17   other contract terms, and/or having access to far fewer patients than they would have but for

18   Defendants' anticompetitive agreement.

**COUNT FOUR – FOR MONETARY DAMAGES ON BEHALF OF THE CALIFORNIA
CLASS UNDER THE CARTWRIGHT ACT, CALIFORNIA BUSINESS AND
PROFESSIONS CODE, §§ 16700 – 16770**

         162.    Plaintiff incorporates the allegations set forth in the foregoing paragraphs as though

set forth herein. The claim presented in this Count is presented as an alternative to the claim

advanced in Count Three and in addition to the claim advanced in Count Two.

         163.    Plaintiff brings this claim under for treble damages, interest, attorney fees and costs

---

CLASS ACTION COMPLAINT                                                            40
78644

pursuant to Section 16750(a) of the California Business and Professions Code on behalf all Delta

Dental Providers in the State of California, who are not owned or employed by any of the

Defendants, that provided dental goods or services to a Delta Dental insured pursuant to a Delta

Dental insurance policy within the State of California within four years of the date of filing of this

action. As alleged more specifically above, Defendants have engaged in a market allocation

scheme and price-fixing that represent arrangements, contracts, agreements, trusts, or combinations

in restraint of trade within the meaning of § 16720 and § 16726.

164.    Defendants have agreed to divide and allocate the geographic markets for the

provision of dental insurance into a series of exclusive territories for each of the Plans. By so

doing, Defendants have also conspired to suppress competition and reduce compensation to dental

providers in violation of § 16720, and § 16726. Defendants' anticompetitive acts are illegal *per se*

under § 16720, and § 16726 or are subject to a "quick look" rule of reason analysis.

165.    As a direct and proximate result of Defendants' continuing violations of § 16720,

and § 16726, Plaintiff and absent California Class members have suffered and continue to suffer

injury and damages of the type that the antitrust laws were designed to prevent. Such injury flows

directly from that which makes Defendants' conduct unlawful. These damages consist of having

been paid less, having been forced to accept far less favorable rates and other contract terms, and/or

having access to far fewer patients than they would have but for Defendants' anticompetitive

agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the proposed Class of similarly situated

persons and entities, respectfully request that the Court:

a.      Determine that this action may be maintained as a class action under Rule 23

of the Federal Rules of Civil Procedure and appoint Plaintiffs as Class

Representatives, and Counsel for Plaintiffs as Class Counsel;

b.    Adjudge and decree that Defendants have violated Section 1 and 3 of the Sherman Act;

c.    Adjudge and decree that Defendants have violated California's Unfair Competition Law, California Business and Professions Code, §§ 17200 *et seq.*;

d.    Adjudge and decree that Defendants have violated the Cartwright Act, California Business and Professions Code §§ 16720, *et seq.*;

e.    Permanently enjoin Defendants from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any of the Delta Dental Plans may compete;

f.    Permanently enjoin Defendants from continuing with any price-fixing and to remedy all effects or vestiges of those conspiracies;

g.    Permanently enjoin Defendants from retaliating against any Plaintiff for participation in the litigation or enforcement of any remedy;

h.    Require ongoing periodic reporting on compliance by the Defendants, monitoring by the Court, and a process through which class members will be represented in any compliance issue at Defendants' cost, all of which should continue until Defendants show that they have corrected the effects of their illegal conduct;

i.    Award the Provider Plaintiffs and the Damages Classes treble the amount of damages suffered by Provider Plaintiffs and members of the Damages Classes as proven at trial;

j.    Award costs and attorneys' fees to Plaintiffs;

1

2       k.    Award prejudgment interest; and

3

4       l.    Award any such other and further relief as may be just and proper.

5                           **JURY DEMAND**

6           Pursuant to Fed. R. Civ. P. 38(c), Plaintiffs demand a trial by jury on all issues so

7  triable.

8

9

10 Dated: December 18, 2019

11                              /s/_____

12                              Daniel E. Birkhaeuser
                                BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER
13                              2125 Oak Grove Rd., Suite 125
                                Walnut Creek, CA 94598
14                              (925) 945-0200
                                (925) 945-8792 (fax)
15                              dbirkhaeuser@bramsonplutzik.com

16

17                              Timothy D. Battin*
                                Shinae Kim-Helms (Bar Number 242484)
18                              Nathan M. Cihlar*
                                Joshua Q. Callister*
19                              STRAUS & BOIES, LLP
                                4041 University Drive, Fifth Floor
20                              Fairfax, VA 22030
                                (703) 764-8700
21                              (703) 764-8704 (fax)
22                              tbattin@straus-boies.com
                                skimhelms@straus-boies.com
23                              ncihlar@straus-boies.com
                                jcallister@straus-boies.com
24

25 *Application to appear *pro hac vice* forthcoming.

26

27                              *Counsel for Plaintiff*

28

---
CLASS ACTION COMPLAINT                                        43
78644